cetera, and when you're ready, we'll hear from you, Mr. Varecki. Mr. Varecki? Yes. Mr. Varecki? Yes. Mr. Varecki?  Yes. Good morning, Your Honors. Good morning. I'm David Varecki, and I'm here for Mike Wease and Mrs. Wease, and they're in the gallery today. Would you stand up, please? Mrs. Wease is out here. I would like to start out on this and talk about this escrow waiver, which this case is really about. And I believe everything flowed from the wrongful revocation of the escrow waiver in this case. A little bit of background. Mr. Wease bought his home in Garland, Texas, in 1991. In 2003, he applied for and received a Texas home equity loan. He made his payments on the loan, was up to date, and on December the 16th of 2010, Ocwen, the servicer at the time, paid the taxes for the 2010 taxes, even though they weren't due until February 1st of 2011. Well, they're due January 1. They become untimely on February 1. Well, they're not delinquent until that. Right. But they're due on January 1. Yes. And on the back of the tax form, it says that it doesn't become a lien problem until six months after they're due. This began the problem that we're here on today. I want to look at first the escrow waiver, because I think that is one of the facts that this court should look at. What we're asking for is a reverse and remand, because we believe there are factual issues that should be decided by a jury. And ultimately, you know, he has been living in this house without paying any mortgage for some time. Ultimately, how would this case resolve if everything went the way you want it to? Well, what we'd like to happen is, of course, the reason he's not paying is because the mortgage company won't accept it. But the fact is money was owed that hasn't been paid. Everybody agrees with that, regardless of the escrow issue. So I'm asking you, if this case proceeded, if you were outlining to your client how is this case going to go optimally, what would that be? It would be we get a factual determination that the escrow waiver was wrongfully revoked and that damages came from that. We believe also the RESPA demands that were made that the trial court dismissed, we believe that the company, Aquin, one of the representatives, Denise was his name, told him where to send the RESPA demand. And he believed, well, that's the new address that they want. So on April the 4th, 2012, I believe, he sent his RESPA demand where Denise said to send it. And it's in the record on appeal. Get me to the end and then you can come back. Okay, we'll come back to the RESPA thing. The main thing here is the escrow waiver, we believe. Right, but I guess what you're saying is then you would recover damages and those would offset what is, quote, legitimately owed on the loan or what would happen to the loan is what I'm saying. What we would like to do, and we've done this many times, is take the arrearage and put it on top of the loan so it's not due until time of sale, so it doesn't affect the payments so that it's not affordable. So we want to make it affordable, but we want this escrow waiver thing out of the way as far as we want to get back on an escrow waiver if possible because we believe if the court and the jury back in Dallas would say that this was wrongfully done, then we believe we have a chance for getting another escrow waiver. But what happens to the amount of money owed to date? In other words, and I understand why he's not paying and everything, but there's this period of unpaid mortgage payments regardless of the escrow that would be due. What happens to that? It is put on top of the loan. What we would request as far as settlement of that, put it on top of the loan, hold it there until time of sale so that it doesn't affect the monthly payments. Okay, I see what you're saying. And then it's affordable and we can deal with it. And then resume payment on what was originally paid, what was originally being owed, and then he resumes paying his own property tax. Correct, Your Honor. Let's look at the escrow waiver. This is on page 666, the devil's number. I was just getting there, I know. That was why I could remember it off the top of my head. On the escrow waiver, which was signed by Mr. Weiss back when he did the home equity loan back in 2003, if you look at the second to last paragraph, it goes into what can happen or how the OCWN would revoke the escrow waiver. And it says, in the event the borrower fails to comply with any of the above conditions, then OCWN could revoke the escrow waiver. Well, and he clearly failed to comply with the all real estate taxes are paid when due. I mean, he did ultimately pay them in 2010, but he didn't pay them when due or even close to due. All right, let's look at the facts of it, Your Honor. Okay. First off, those taxes were paid on 2009. It's the first time he'd been late on taxes, but he paid. There was no lien involved. But he paid way late. He didn't pay when due. He paid them on 6-30 of 2010. And OCWN did not take them. Mr. Brickey, maybe I'm not asking the question very clearly. Did he pay those taxes when they were due? No. Okay. So as far as the facts in the case, and that's what we want to be able to have a jury look at, the OCWN did not take over the loan as the servicer until August of 2010, about a month and a half after this tax problem with the 2009 taxes. OCWN, we believe, did not even know there was an escrow waiver there. We think that the whole argument about the taxes in 2009 came up later. And the reason we know that is I took the deposition of the corporate representative of OCWN, and let's take a look at what the corporate representative said. That's in the Record of Appeal. This was back on February of 2015. Let me find her. Okay. Well, she says on 2000, back in February of 2015, that essentially the ‑‑ I asked them about what their procedure was when they took over a loan that had been worked by other people. And she said, here's my question. This is on page 935 of the record. When OCWN takes over the servicing of a loan, do they look at the history of the loan to understand what payments have been made in the past? She answered, no, they just basically, when we get servicing transfer, there's a process that things go through. The information from the prior servicer system, then down to line 19. We are told by the prior servicer that the information is accurate and correct and that they serviced the loan correctly, and we rely on that statement, I asked then. So the quality checks that you got from the prior servicer indicated that Mr. Weiss had made the payments on time and was a good borrower, correct, she said. We wouldn't have looked, and this is on page, the next page. We wouldn't have looked and made sure that he, what his payment history was. We would have just looked to see whether he was current at the time. OCWN began servicing it, and he was current. So that was their examination of what. But the fact that he was current on his payments doesn't change the fact that he didn't comply with the escrow waiver agreement. He didn't pay his taxes when they were due. That's another fact issue, Your Honor. Okay. I used to teach English before I went to law school, and if you look at the waiver back on the devil's number, 666, it says all real estate loans, all real estate taxes are paid when due. The evidence is furnished to a lender at that time. Our, I believe, means present tense and in the future. When OCWN took the loan over in August of 2010. Can OCWN not step into the shoes of their predecessor? So if their predecessor had a certain right to repeal the escrow waiver agreement based upon the failure to pay when due, does OCWN not step into that shoe? I think that's a fact issue for the jury, Your Honor. Why is that a fact issue? Why is it when you take over a contract, you step into the shoes of the prior contracting party? Because if you look at Section 9 of the security agreement, the deed of trust, it says that they can do what are reasonable and appropriate means to protect their interest. So when I hear reasonable and appropriate, I think that's a jury issue. Yeah, but we don't need a bunch of, like, imagined thoughts here because we have an actual agreement that's very specific. Yes. It says, hey, this is an election not to collect escrows and shouldn't be deemed a waiver of lender's rights to do so at a future date, one. Two, in the event borrower fails to comply with this specific list, not just vaguely anything to do with the loan, then they have the right to do this. And so it seems to me we don't have to look at what's reasonable and appropriate. They've been given this right, whether it's unreasonable or not, to not to revoke the waiver, if you will, of the escrow, and then that puts us back into the escrow world that's in the main document. You just said why it's a jury issue, because the judge decided it was unreasonable, and you said that. No, I'm saying it doesn't matter whether it's unreasonable. What I'm saying is reasonable and appropriate matters if the document doesn't provide the remedy or doesn't provide the situation, then the question is was it reasonable and appropriate what they did. But here what I am saying is that the document itself says if you don't pay it when due, we have the right to establish a fully funded escrow account, whether reasonable or not. I mean, it doesn't say that part, but it doesn't have to. When you have a specific remedy in a specific document that's an addendum to a more general document, you follow that. Why isn't that basic contract construction? You've got to construe it in relation to the whole document. The whole document is the deed of trust that gives the power to the mortgage company and the servicing company, and that power is to revoke the escrow waiver, which they didn't do properly, by the way. That's a separate question. That's a whole other question. But this specifically says lender has the right to establish a fully funded escrow account. It doesn't say that has to be reasonable. So even if it's unreasonable, they had the right to do it. Your Honor, Section 9 of the Security Agreement says it has to be reasonable and appropriate. That's the language they use. Well, but I'm saying that's general language that I'm not convinced, and maybe with your English background, it's the only language I speak, but maybe I can still learn some. Even with that, when you have the specific, it controls over the general. So why wouldn't the specific of the escrow waiver control over the general of the reasonable and appropriate, even assuming that what they did was unreasonable? Because I say it doesn't say what you say it says. I say it says are, which means prospective in the future, instead of if it had written has been paid when due. Okay. We are here. That's present. Yes. I don't see that as a future. Do you see a triable issue of fact just in Section 9, or are you arguing that there are triable issues of fact in Section 3, which is antecedent to whether we even get to Section 9? They're all over the place, Your Honor, I believe. That's one of them, is Section 9, whether or not, because the trial justice. We've talked a lot. You've got a minute to talk about anything other than Section 9. Okay. So what other sections do you have a triable issue of fact related to? As far as the way the waiver is supposed to be executed, it's supposed to be, if you read the language carefully of how the waiver is supposed to be executed, they're supposed to give notice of revocation first, and then upon notice of revocation, then an escrow account is set up for the borrower. So they're supposed to give notice of revocation. And you understand them to say that notice was what in this case? The defendant contends that the notice was a June 6, 2011 letter that said it was about the escrow account. It didn't say anything about revocation of the escrow waiver. And the language in the deed of trust says specifically how it's done in Section 3 of the deed of trust, that the escrow waiver has to be done first, and then upon that, meaning after, then an escrow account is set up. Why is it that way? It's so that the homeowner will know that he doesn't have an escrow waiver anymore. I think you've gone past answering the question, and you've reserved time for rebuttal. Okay. Thank you. That time goes fast. When you're having fun. When you're having fun, yes. All right. Mr. Schwest? Schwest. Schwest. All right. Good morning, Your Honors. May it please the Court. My name is Brett Schwest, and I represent the Appalese in this case. I'd like to go back to the point the Court was discussing just now with respect to the revocation provisions. There really is no revocation provision in the escrow. Before you get to that, what were you saying was your notice? How did you comply with notice? The notice of the revocation, which was provided with the June 2011 escrow account. That was the notice. So you're saying it's effective notice to do it six months after you've revoked? Well, if you look at the escrow waiver agreement, although Mr. Verriquez would like to impose a revocation provision in there, there really is no revocation provision within the escrow waiver agreement itself. But is the escrow waiver agreement reliant upon 3 and 9 in the security agreement, or are you saying it's a separate right in addition to whatever's in 3 and 9? The only thing that triggers the ability to be able to set up the escrow account within the escrow waiver agreement is that the real estate taxes are not paid when due. And as the Court pointed out, they're due at the beginning of the year, frankly. But how can you give notice for something you did eight months earlier? Well, again, there's nothing in the escrow waiver agreement itself that says you have to give notice of revocation. Okay, so first you're challenging the notion that you have to give notice. That's your answer. Then the second point, assuming, argumentatively, you do have to give notice that Sections 3 and 9 are relevant to the escrow waiver agreement, then what I'm trying to understand is the argument that the June document gives notice of what you're now doing. In other words, before June, you hadn't actually charged him the escrow amounts. It was only after you sent the June document that you began collecting the escrow, and that's what you have to give notice of. So it's not six months late, it's two months early, or what's the argument there? Well, the argument is that, again, there's no specific revocation notice requirement. Right, okay, but we're past that. I'm saying assuming, arguendo, we disagree with you in fine, that there is a notice requirement, then you have this June argument, so explain the June argument. Is it that you are giving notice of something that already happened, or are you giving notice that now we're going to start to collect the escrow we've established? I would say both. Okay. And if you look at Section 3 of the deed of trust, what it talks about is if an amount is not paid due, that the lender has the right to exercise its rights under Section 9 of the deed of trust, which we'll turn to that in a second. But it separately says lender may revoke the waiver as to any or all escrow agreements at any time by notice given. It doesn't say that that notice is triggered just because the payment wasn't made. The ability to exercise your Section 9 rights. Okay, so you could sit there. You can't sort of waive the waiver, if you will. So what you're saying is that you're sitting there knowing that they've been untimely, and you're putting up with it, and then you go, no, I'm not going to put up with this anymore. I'm going to create an escrow account a year later and send the notice, and that's what you did in June. Is that the argument? The notice was sent in June, but the action was taken in December. Well, then that feeds into the argument that Judge Higginson is saying is that appropriate notice to give it six months later. And my question was it didn't seem like you were collecting it until then. That's correct. And so that's what you really have to give notice of is that we're changing the world. We're not just setting up an empty escrow account for fun. We're now filling it with money from you, Mr. Weiss, and that's what happened in June. Right. Okay. And you didn't start trying to collect the money until August, right, after the June? And spread it out over time. But it wasn't retroactive. The collection? Yeah. Okay. It was not effective as of December. Did you go back and try to collect the money from December in August? It would be spread out going forward. Going forward. So going forward from August, if the taxes are $4,000 and we have four months left, then $1,000 a month? In addition to what had been built up in the escrow account, yes. Okay. So then you are collecting the past. Collecting going forward. The past and the future. Right. So let me come at it again. If the taxes for the year would be $4,000, but you have four months left of the year when you give notice, you would be collecting $1,000 a month? On those taxes, yes. Yes. Are there some other taxes you're collecting? What was paid in the escrow? You were paid. Sorry, what was paid? But that's for the year, for that year. The taxes paid in December of 2010 were for 2011. No, they were for 2010. Due on January 1. They were for 2010. For 2010, due on January 1, 2011. They were due right then and there when they were paid, actually, as the Court has pointed out previously. The taxes become due at the beginning of the tax year because that's when the lien is. Okay. I understand that. But then, so were you collecting the 2010, the December 16, 2010 payment, plus what would be due on January 2012? Going forward, yes. Well, can you answer my very specific question? When you sent this notice in June of 2011 for prospectively August of 2011, were you collecting payments that were a percentage of what had been paid for the January 1, 2011 bill only, or for the January 1, 2011 bill plus the anticipated January 2012 bill? The latter. Okay. And all of that was being glommed into these last four months. Right. And how does Mr. Weiss afford that when that's suddenly a much bigger number than he was used to paying? The taxes had to be paid regardless. The statement was made previously, this isn't affordable. I mean, he either has to pay the taxes as part of the escrow or he has to pay the taxes separately. Okay, but I don't know his life. I mean, maybe he gets a bonus in December and that's what he uses, or he gets a bonus in some other month or whatever. I mean, people make money in weird ways. Sometimes they have, like, maybe he sells Easter bunnies, and so he makes a lot of money in March or April. I mean, I don't know what's affordable for him month to month. I do know that when you take two years' worth of stuff and put it into four months, that can be expensive for anybody. It can spread out over time. But, yes, if that was the nature of his income or revenue stream, and perhaps that's what he used to negotiate the escrow waiver in the first place, he violated the escrow waiver at some point, and therefore, I mean, the right to collect it. Do you understand why we're a little, like, we're having a little trouble getting where we're going with here? Because, I mean, it seemed like it took me five minutes to even get to what you were charging him. Can you see why this was confusing for him? I'm not sure I understand. If he didn't, HOMEC was the prior servicer, and in the end, they didn't revoke. So he doesn't know until that first letter. And at that point, the point is the money you are claiming is very high. So had you given him notice, and your answer, your primary answer is we don't owe anyone notice under this contract. Is that it? Under the escrow waiver agreement, there is no notice provision. And I agree with that. The question to me is whether the escrow waiver agreement, as an addendum to the security agreement, is subject to the provision in Section 3 that says we can waive this, we can waive this Section 3, and when we do, we can revoke that by giving notice. That seems to anticipate the document that is the infamous 666. Well, actually, it starts off under Section 3 that he's supposed to make the payments. Then it says if there's a waiver. I'm aware of that. I'm looking at it. But it says at the end, if there's a waiver, which there is here, then with notice we can blah, blah, blah. Why wouldn't that be a modifier to the escrow waiver agreement that itself doesn't say anything about notice? If you look up above, it says that they can impose a waiver or agree to a waiver at any time. And the last sentence that you're reading from says they may revoke it at any time. It doesn't specifically tie it. By a notice. That talks about the means to do it. That's correct. Okay. But it doesn't talk about why you do it or how you do it. Fine. And that's great. But now we're to this issue of the notice being given by your admission six months late and then glomming all this different money together into a four-month or five-month period, depending on how you count it. I would contend the notice was not late because the revocation is not required to exercise the rights under Section 9 and pay the taxes in December. There's nothing in there that says you have to give the notice to do that. If you read the sentence as they read, you're disjuncted. It doesn't tie giving the notice to the failure to pay the taxes. Okay, but you keep saying exercise their rights under Section 9, but the sentence goes on, right? Which sentence goes on? Section 3. Once they fail to pay, you get to exercise your rights under Section 9 and what? And you can also pay such amount as well. Pay such amount. So the amount that pays such an amount, not future tenths, pay amounts that they hadn't paid in tax. Well, that could be disjunctive because if you go to Section 9. The word and could be disjunctive? Yes. It would give you another option of what you can do. You have different remedies under Section 9. So in your theory, if they are late but then catch up, you could wait forever under this contract and then at any point impose the waiver? No, that's not what I'm saying. What I'm saying is the right to pay the taxes under Section 9 is one of the remedies, and it's specifically delineated as such. It's triggered by if they fail to perform the covenants and agreements contained in the security instrument. Then you can do whatever you need to do to take care of the property. Whatever you need to do to pay the amount that wasn't paid, not to create an escrow for all future years. I said do whatever you need to do to protect the lender's interest in the property. That's Section 9. That's Section 9. But Section 3, okay. And then it goes on to say— That's the reasonable and appropriate that I already said we're not going to talk about because the escrow waiver agreement itself doesn't contain that. But if you're going to rely on 9, 9 has that reasonable and appropriate, and that sounds jury-esque. Because it specifically delineates an action that is included within that as paying any sum secured by a lien, which has priority over the instrument, which is the taxes, that were in place in 2010. Honestly, I find it shocking that you guys are here. I mean I saw a lot of these kinds of cases as a state district judge, and they would settle long before you'd get to this kind of position, and it just seems very odd to me that you're here. I'm not going to get in the middle of that. It's not my place to settle the case. But I will just simply make that comment that it's very odd that you all haven't been able to work this out. But go ahead and make any other arguments you want to make. We'll decide the case on the law, and I will not consider that point at all. But the former trial judge in me is just bursting out a little bit with that comment. And to address that point, Your Honor, these home equity cases are difficult for that reason because there's no personal recourse, and it throws a monkey wrench into the works. And so the only rights you have as the lender to collect are going to be by foreclosure, and that's why we're here, and the payments have not been made. You know, I had a case once where we settled for some money and an apology. You wouldn't have ever been able to get an apology out of a jury trial, but that was part of the settlement. Anyway, again, neither here nor there. We'll decide this case on the law and the facts under the standard of view present. Is there anything else you want to present to us? I think we've hit the crux of what the case really is about in the court side, because I think that's the threshold issue. I can get into the other finer points, but I don't think that's going to aid the court significantly here today. So I will give my time back to the court. Okay. Thank you. We appreciate it. Rebuttal, Your Honor? Absolutely. Yes. If you look at that notice of June 6, 2011, it says nothing in there about revoking the escrow waiver. Why is that important? Mr. Weiss, in his affidavit attached, says he thought that was a mistake, because I've got an escrow waiver. He had no idea that his escrow waiver had been revoked. He had paid his taxes, but the county hadn't sent him the check back, so he didn't know that it had been revoked. Oh, so the county collected both. Yes. The county doesn't let go of money very quickly. Did they credit that to the future? No, they finally sent it back to him, eventually, but it was a long time. So he didn't really know until 2011 that his escrow waiver had been revoked, and then all of a sudden he owes all this money that his payment went up from $6.75, $6.72, to about $13.50, which for somebody that doesn't make a whole lot of money, that's a huge increase. So now he wants to know what the deal was, and then he starts writing the RESPA letters, and Ocwen, of course, says, well, they don't say it. Judge Salih said it in his judgment. He said, well, you sent it to too many different places, the RESPA letters, so you're not really entitled to an answer. He called after he didn't get a very good answer after the first RESPA letter, and Dinesh at Ocwen told him to send it to this Springfield, Ohio address, send his letter. And so he did, and he still didn't get a decent answer about why his payment went up so much. About this reasonable and appropriate, I'm looking at, this is on page 978. This is the discussion in Judge Salih's order saying that where he talks about reasonable and necessary, he says, this is on the first paragraph in the discussion in his order, such breach allowed Ocwen to do whatever was reasonable and necessary to protect their interest. So he's using that. He believes that's important, that whatever's reasonable and necessary, and ultimately he finds that it was reasonable and necessary when Ocwen did. But isn't the language actually reasonable or appropriate? Excuse me. Yeah, reasonable. Or. Do whatever is reasonably necessary to protect their interest. The language is. Reasonable and appropriate is what the actual language is. Or. Judge Salih didn't mention appropriate, but he. He says, then lender may do and pay for whatever is reasonable or appropriate. Am I looking at the right? Let's see, this is on page. One, two, three, four, five, six, seventh line of 650. I'm sorry, I'm looking at 978. Section nine of the deed of trial. Oh, okay, this is Judge Salih's. No, no, but I'm looking at, I appreciate Judge Salih's comments. I'm actually looking at the language of the comment. Oh, okay, the other reason. And I'm simply saying, am I quoting the right part? That it says, if blah-biddy, blah-biddy, blah, then lender may do and pay for whatever is reasonable or appropriate. To protect its interest. Right. Correct. Okay, so it's an or. That's the part that we believe. It might be unreasonable, but as long as it's appropriate, it's okay. Or it might be inappropriate, but as long as it's reasonable, okay. So we believe that just screams jury question. And so, and we think we've got a bunch of stuff we can show the jury, this wasn't reasonable, what they did. Because they're supposed to let him know first that it's been revoked, then set up the escrow. What is the status today? It is about, let's see, we have had. Are they in the property? Are they still there? Still in the property. They're still there. Yes. All right, so what else is the status? They're not paying mortgage. Rightly or wrongly. Who's paying the taxes? They're paying, guess who? Us. Okay, I understand. Who's paying the taxes? Yeah. Are they paying taxes? They are paying the taxes, yes. Because I know the city would come after them if they weren't. Right. They would pay a lien and then they would foreclose, yes. Okay. They haven't made a payment to OCWEN. What are they doing with OCWEN? Let's see. Since back in 2012, I think they had, we totaled it up, I think they had made $64,000 payments to the mortgage company during the time up until all this controversy came up, and about $58,000 of that had gone to interest. That's true with all loans. They had been making their payments. These were good people. What does OCWEN claim is due if foreclosure were allowed to proceed and they wanted to stop it by paying, what would they have to pay? They say that, I believe it's about, the total bill right now I think is $180,000, something like that. And as I said earlier, what we would attempt to do is put that on top of the loan. I understand that. You heard my comments. Yes, I did. Okay, thank you both. We appreciate it. And the case is under submission.